# DICKERSON C. McCLUNG v. STAR CHRONICLE PUBLISHING COMPANY, Appellant.

### Division Two, April 9, 1918.

1. **LIBEL: Newspaper Aricles: Read Together.** Where a suit for libel is based on alleged charges contained in certain newspaper articles, it is proper to consider prior articles in the series to which reference is made in the ones complained of, in order to determine the meaning of the alleged libelous charges and to show malice.

2. ———: **Public Officer: Charges and Criticism: Malice.** The rule which permits the criticism of public officers is the same as that which governs the criticism of all matters of public interest, such as public institutions, places of entertainment, books and pictures. That rule distinguishes between charges of conduct admitted to be true and criticism thereof, and false charges of misconduct and criticism based on an assumption of their truth. In the latter case, the charges being false, the falsity of the charges carries the malice into the criticism and there is no burden on the plaintiff to show that the criticism was malicious; in the former case, the charges being true, the burden is on the plaintiff to show that the criticism is malicious, in that it is unjust, malevolent or exceeds the bounds of fair opinion.

3. ———: ———: **Charges Established: Criticism Characterizing Treatment of Convict as Torture.** The charges in the newspaper publication were that the plaintiff, who was Warden of the State Penitentiary, had (1) whipped convicts, (2) had kept a particular convict suspended by his hands in rings, attached to the wall over his head, his feet resting on the floor, for fourteen hours a day for twenty days, and (3) that he had thus kept him in the rings in order to compel him to confess where he had obtained whiskey and heroin; and these charges were either admitted or established by testimony that was uncontradicted. *Held*, that, editorial comment that the punishment was "twelfth-century torture methods," was not a charge, but a justifiable criticism. When plaintiff kept the convict in the rings as he did to compel a confession he used "torture" within the dictionary meaning of the word.

Appeal from Callaway Circuit Court.—*Hon. David H. Harris*, Judge.

REVERSED.

*Virgil Rule, Richard A. Jones* and *N. T. Cave* for appellant.

The publication declared upon in the first count of plaintiff's petition is an editorial published November 12, 1913, in defendant's newspaper, "The New St. Louis Star." (1) Under the evidence and law applicable thereto, plaintiff was not entitled to recover and the trial court erred in refusing to give to the jury the instruction requested by defendant, directing verdict in its favor. (a) At the time of making the publication and thereafter, plaintiff was a public official, the warden in charge of the Missouri Penitentiary, a public institution of the State. It was as to the present conduct of that institution that this and other publications declared upon were addressed; the treatment and punishment of prisoners therein, a condition that required prompt remedy, action inducing such end by those responsible for the establishment and maintenance of such institution, the citizens of the State. All had a direct interest in such subject and a right to be informed concerning it; the publications were within the class designated privileged. Finley v. Steele, 159 Mo. 305; Holmes v. Royal Fraternal Union, 222 Mo. 556; Cook v. Publishing Company, 241 Mo. 326; Coleman v. Mac Lennan, 78 Kas. 711; Briggs v. Garrett, 111 Pa. St. 404; Schull v. Hopkins, 26 S. Dak. 21; Gandia v. Pettingill, 222 U. S. 452; O'Rourke v. Pub. Co., 89 Me. 310; Ashford v. Newspaper Co., 41 App. Cases (D. C.), 395. (b) A qualified privilege extends to all communications in which the party communicating has an interest or in reference to which he owes duty to those having a corresponding interest or duty, including cases where the duty is not a legal one, but of a moral or social character. Cases above. (c) Where the publication concerns that in which the publisher has an interest or owes a duty to others having a corresponding interest or duty, whether such be legal or of a moral or social character, a qualified privilege exists, in order to overcome which the burden is upon the one charging the

publication to be a libel, to establish the falsity of the language of which he complains and that the publisher was inspired by express malice toward him in causing the publication. 25 Cyc. 524; Finley v. Steele, 159 Mo. 229; Ashcroft v. Hammond, 197 N. Y. 488; Cornelius v. Cornelius, 233 Mo. 30; Trimble v. Morrish, 15 Mich. 624, 16 L. R. A. (N. S.) 1017. That a newspaper has the right to make publication concerning and comment upon matter of public interest and that the doctrine of privilege under the law of libel permits an honest censorship by the newspaper press over the conduct of officials in the management and conduct of public affairs is well established. Branch v. Knapp & Co., 222 Mo. 603; Cowan v. Fairbrother, 118 N. C. 418; Bearce v. Bass, 88 Me. 521. (d) The record fails to establish that the comment contained in the publication was inspired by malice, and the facts upon which based false. Fails to establish either of such contentions. Indeed, it is apparent such publications were amply justified by existing conditions. They were neither false nor unduly severe and if the contrary could be in any manner inferred, this does not prove them to have been inspired by malice. 25 Cyc. 524; Schull v. Hopkins, 26 S. Dak. 21; Laughlin v. Schnitzer, 106 S. W. 908; Everest v. McKenny, L. R. A. 1917-D, 779. (e) Whether or not the publications were privileged was a question of law for the court. Holmes v. Royal Fraternal Union, 222 Mo. 556; Callahan v. Ingram, 122 Mo. 355. (2) Plaintiff's failure to deny a charge made in the presence of the one affected thereby, is evidence of the truth of the charge. Much more so where plaintiff at the trial of his cause makes no denial of and concerning testimony attributing to him certain statements. The matter charged stands admitted. State ex rel. v. Flynn, 66 Mo. App. 373; Bank v. Levy, 106 La. 164.

*Ed. E. Yates, A. T. Dumm, W. C. Irwin* and *J. R. Baker* for respondent.

(1) That a newspaper may fairly criticise and comment upon the official conduct of a public officer is

McClung v. Star Chronicle Pub. Co.

indisputable. *Non constat,* that it may pass the boundary line of fair, legitimate comment or criticism. "Written words which impute that one who holds office has been guilty of improper conduct in that office, or has been actuated by wicked, corrupt or selfish motives, or is incompetent for the position, are actionable." Cook v. Pub. Co., 241 Mo. 348. This quotation is apropos to the language declared on in the first count of respondent's petition. This language follows: "He can order abolished all inhuman practices in the penitentiary. He can remove the warden and the guards— everyone who was a party to the barbarity which has horrified the world. The same publicity will be given the Governor's action in doing away with twelfth century torture methods that was given the exposure of it. It is up to the Governor, and if he honestly desires to give his State the best advertisement it ever had, he will at once do away with all methods of torture in the Missouri Penitentiary." This language rises above mere comment or criticism. Its real sting lies in the statements of fact that twelfth century torture methods, brutality and inhumanity were practiced by respondent in the prison. The cases cited by appellant are entirely inapplicable. There is a wide distinction between privileged communication and fair comment. Privilege ever goes down before falsity. Cook v. Pub. Co., 241 Mo. 362; Link v. Hamlin, 193 S. W. 238. Moreover, as observed in Cornelius v. Cornelius, 233 Mo. 31: "A lie is never privileged. It always has malice coiled up within it. When a man coins and utters a lie, or when he repeats it knowing it to be false, the law implies malice; he cannot shelter himself behind the doctrine of privileged communication. It is mistakes, not lies, that are protected under the doctrine of privilege." This language fits the instant case on all three counts like a glove. The appellant newspaper knew the facts, yet steadfastly refused to print them. Each of the articles in question fails to state the facts with reference to the punishment. They indulge in fierce denunciation,

leaving the reader to understand and believe what his imagination may suggest, to-wit, that "twelfth century torture methods," inhumanity and brutality obtained as a regime of punishment in the Missouri Penitentiary. Nothing more iniquitous could have been suggested than this well understood English implies. The rack, the boot, the thumb-screw, trying by fire, all of the old-world torture chamber methods, are brought vividly to the understanding mind by such words. Price v. Whiteley, 50 Mo. 441; McGinnis v. Knapp, 109 Mo. 150; Pledger v. State, 77 Ga. 242; Hoare v. Silverstick, 12 Q. B. 624; Newell on Slander & Libel (2 Ed.), p. 568, sec. 7. "Written or printed charges of cruelty or heartless and inhuman conduct are actionable *per se,* since they excite the hatred of the community." 25 Cyc. 259. Under the evidence there is no question of privilege left in this case. When, as in each of the articles sued on the facts are not given, it is for the jury to say under all the evidence if the statements by way of denunciation are libelous. Cook v. Pulitzer, 241 Mo. 357. (2) The evidence of McClung, as well as of the Deputy Warden, who had charge of this matter of punishment, is directly and unequivocally to the effect that the convict was not punished in an effort to extort from him a confession, but because he had contumaciously violated a prison regulation; a matter of vast importance, considered in the light of the baleful results that might flow therefrom. Respondent's statements in this regard made, of course, an issuable fact properly solvable by the jury.

ROY, C.—Plaintiff's petition in three counts charges defendant with libel. There was a verdict for plaintiff on all counts, and the damages were assessed by the jury at $5000 actual and $5000 punitive damages on each count, making a total of $30,000. The trial court compelled a *remittitur* on each count of $4000 actual and $2500 punitive damages, and entered judgment on each count for $1000 actual and $2500 punitive damages, in all $10,500.

The defendant has appealed.

Plaintiff was Warden of our State Penitentiary for a term beginning March 24, 1913. The defendant is a corporation, and the owner and publisher of "The New St. Louis Star," a newspaper published in St. Louis and circulated throughout the State.

For many years, as long at least as the knowledge goes of those connected with the institution, one form of punishment for violation of the rules of the penitentiary was to put the offenders "in the rings." They were handcuffed, and their hands were then held just a little above their heads by being attached to rings which were fixed in the concrete walls of the cells in what is spoken of as "Punishment Hall." They stood with faces to the wall. There were twenty or more cells in that hall furnished with those rings, fixed at different heights in order to fit different individuals. Whipping was another form of punishment. The evidence for plaintiff shows that there were about four whippings in the year just preceding the trial in this case. The evidence does not show for how many hours a day, nor for how many days successively, any prisoner was kept in the rings prior to the time when plaintiff became such warden. The total number of convicts is about 2500, of whom about ten per cent have seen previous experience as such. About five per cent are incorrigible and hopeless, many of them addicted to whiskey and "dope." The victims of the whiskey and drug habits are active in inducing others to indulge therein, the over-crowded conditions of the institution furnishing abundant opportunity for such work. The whiskey and heroin tablets are introduced surreptitiously, and, when very scarce, sell in the prison at almost fabulous prices.

On October 20, 1913, one Steve Willis, a convict, was found with a bottle of whiskey on his person, and heroin tablets were found in the place where he worked. He was put in the rings. On November 10, 1913, an article was published in defendant's paper, the important parts of which are as follows:

"Missouri's Shame Published to the World.

"Three press associations, two of them with international alliances, sent out to the civilized world Friday the story of a helpless Missouri convict hanged up by his wrists in steel handcuffs for eighteen days. These same press associations, the day following, sent over their wires the statement that the Governor of Missouri and his Board of Prison Inspectors heartily approved of this hideous torture.

"Information that a convict was being subjected to this barbarous torture came to the New St. Louis Star last week from such an unquestioned source that it could not be ignored. A trained, trustworthy correspondent was sent to Jefferson City. He found the prisoner Steve Willis, hanging on the door of a room in the Penitentiary, his wrists held tightly in a pair of steel handcuffs. His feet rested on the floor—the guard and prison physician were careful to call attention to this. It was shown by them, too, that the victim could move as much as two feet in either direction and he was fed bread and water twice a day, Also, in an excess of kindness, the jailers permitted him to sleep ten hours of each twenty-four, without blanket or mattress upon the steel floor. At 7:30 each morning the guards fed him his mouthful of bread, washed down with a cup of water, before they strung him up for another fourteen hours of torture.

"And do you not consider this fourteenth century inhumanity a splendid advertisement for the imperial State you call your own? Will you not be proud hereafter to say you are a Missourian, a citizen of a State which sanctions through its Governor and his appointees, a brutality that would incite to insurrection in Turkey?

"They burned men and women at the stake once. The pain they endured was frightful, but it did not last long. Convict Willis was tortured for twenty days. And after twenty days, broken in spirit and almost dead from exhaustion, Willis 'confessed' that he got the whiskey found in his possession from a negro trusty.

So they let the beaten convict down from his cell door. But the negro trusty accused by Willis will take the latter's place, strung up on the door of the cell, fourteen hours of the twenty-four, until he tells where he got the liquor outside the prison.''

And on the same day another article was published in that paper, of which the following is the material part:

''Prisoner, Tortured 20 Days, Confesses Whiskey Smuggling.

''Negro Trusty is Implicated and is Put in Chains. Major Approves.

''Punishment is admitted Barbarous but is held Necessary.

''After twenty days of torture and starvation, by being strung up and fed on bread and water, Steve Willis, a St. Louis convict serving a term in the Penitentiary at Jefferson City, confessed Sunday the whiskey morphine found in the possession recently had been obtained from Major Wright, a negro serving seven years for robbery.

''Wright was put up in the rings Monday morning and will be strung up and starved until he tells where he got the whiskey and drug. Warden McClung stated that he will continue the treatment as far as necessary to reveal the source of smuggling which had been furnishing convicts with liquor and drugs in large quantities.

''Major favors 'Stringing Up.'

''Governor Major told a reporter for the New St. Louis Star at the Planters Hotel Monday that he was not opposed to stringing Penitentiary prisoners up by their wrists and that such a custom is to continue in the institution. 'The prison officials have the right under the law and they can prescribe any punishment they see fit,' he said. 'Any punishment?' asked the reporter. 'Yes, any punishment within reason. I see by the newspaper that Willis has confessed and now

the prisoner he accuses will be strung up in the same way until he confesses.' ''

On November 12th thereafter it published this:

"How Major Can Advertise Missouri.

"Governor Major in an address to the St. Louis Advertising Men's League, urged the members to advertise Missouri. A pity 'tis that the Governor did not practice his preaching. Missouri never has had such unfortunate advertising as that given it by the Governor and his Board of Prison Inspectors in the Steve Willis case.

"The New St. Louis Star is heartily in favor of advertising the marvelous resources of St. Louis and Missouri. There is good advertising and bad advertising and the kind the Governor and his official family have brought upon the State is the worst kind imaginable. The Governor, however, can, in part at least, counteract the effect of the Willis case. He can order abolished all inhuman practices in the Penitentiary. He can remove the Warden and the guards—everyone who was a party to the barbarity which has horrified the world. The same publicity will be given the Governor's action in doing away with twelfth-century torture methods that was given the exposure of it. It is up to the Governor, and if he honestly desires to give his State the best advertisement it ever had, he will at once do away with all methods of torture in the Missouri Penitentiary. It is all up to Governor Major."

On the next day it published this:

"Warden McClung's Crude Attempt to Evade Responsibility.

"In tardy deference to an aroused public indignation, Warden D. C. McClung announces that he will abolish torture in the Missouri Penitentiary, if The New St. Louis Star will suggest a substitute therefor. This rather crude attempt to evade the responsibility for a barbarous practice will deceive no one, not even the Warden himself. It is an open confession of incompe-

tency.   There is no more reason why a newspaper should direct reforms in a Penitentiary than there would be for a warden to operate a newspaper.

"If Warden McClung desires honestly to abolish cruelty, he will have no difficulty in learning the methods which have been in use for years in other prisons. The New St. Louis Star suggests that he write to the Wardens of the state prisons in Illinois, Kentucky, Colorado and to the Superintendent of the United States prison at Atlanta.   These men have not only done away with all punishments that even savor of cruelty, but have inaugurated honor systems which are not only demonstrating their superiority to the old methods, but are resulting in a real reform of those sent under their care.   Reform, after all, is the primary object to be attained by our criminal law, and no convict can be reformed by brutality."

And on the 25th of that month it published this:

"The Will of the People.

"Editor The New St. Louis Star:   The American people know what is right and wrong in the conduct of their public officials.   The people of this State know what is reasonable and unreasonable when it comes to whipping or torturing helpless convicts in the State Penitentiary who are at the mercy of the State.   They know that Warden McClung went beyonds the bounds of reason in his punishment of Steve Willis.   Whoever or whatever may prescribe the rules and regulations or 'discipline' of the State Penitentiary, no warden has a moral or constitutional right to inflict cruel and unusual punishment upon any prisoner or convict for infraction of said rules, no matter what the warden's pretext may be for doing so.   The people of this State will not stand for it and public sentiment is against it.   This question will 'not down' with the people.   Warden McClung has demonstrated that he is not a fit person for the position he now holds.   If it be true that Warden McClung should have said 'That he would keep Steve Willis strung up in that handcuffed posi-

tion on a diet of bread and water until he died unless he confessed,' then in the name of humanity, civilization and religion, how is it possible for the Board of Prison Inspectors to continue such a warden and his subordinates, in office? The Missouri State Penitentiary is bound to become a reformatory institution, because the people of this State will it so. No public official is above and beyond the reach of the will of the people. He dare not override their will. To cruelly punish convicts accomplishes no good whatever. In fact, the criminal convict comes out of the Penitentiary a worse man (an enemy of society) than when he first went in. This is history—it is the truth. George A. Ritter.''

The three counts of the petition are based on these last three articles in the other named. The other two articles were read in evidence by plaintiff.

The answer admitted the publication of the articles as set out in the petition, and denied all other allegations.

The pleadings are sufficient to raise all the points to be discussed herein.

The evidence on both sides shows that Willis was in the rings twenty days. He was fed a slice of bread in the morning and put in the rings at 6:30. He was let down at 3 p. m. and given another slice of bread. He was given all the water he wanted. He slept on a board on the floor of the cell. As to whether he was again put back in the rings at 3:30 p. m. and kept there until nine, the evidence is as follows:

Willis testified that after eating in the afternoon he was again put in the rings, and remained there until bedtime. He had no means of knowing the exact time.

James Owines, Will Hunter and Emmet Phillips, three convicts, testified for defendant that they were in the rings from about 6:30 a. m. to about 9 p. m., with a half hour down in the afternoon to eat. They were up ten, sixteen and eighteen days respectively.

W. F. Elkins testified for defendant that he was night guard in Punishment Hall when Willis was there,

and that he was still such guard. He testified that he went on duty at 4 p. m., and that when he found persons in the rings at that time it was his duty to keep them there until nine o'clock. He further testified thus:

"Q. Did you ever see Steve Willis up there after four o'clock in the afternoon? A. Yes, sir, I have seen him up there.

"Q. He would stay up there until nine o'clock at these times, would he? A. Yes, sir; nine o'clock; that is taking down time.

"Q. What is that? A. That is taking down time.

"Q. How many times did you ever see him up there? A. I don't know how many times.

"Q. Wasn't he every day he was in the rings? A. No, sir, not every day; he was down a part of the time and part of the time he was up.

"Q. What is your best recollection about his being up or down most of the time during the evenings you were on duty? A. I couldn't say about that; I never paid no attention to that; there was men down mighty nigh every evening and they was some up that I would go in there."

He was not cross-examined, contradicted or impeached.

The depositions of Allan Rawls and John Agee, two convicts, were taken by defendant, but put in evidence by plaintiff. They testified that they were in the rings from six a. m. until about 8:45 and 9 p. m., with short intermission in the afternoon to eat. One was up three days, and the other fourteen days. Said Witness Agee testified that it was in December, 1913, that he was in the rings as stated by him. The evidence of both those witnesses tended to show that punishment in the rings was not very severe.

The plaintiff testified as follows:

"He was strung up about nine hours or ten hours a day. I think about nine or ten hours. He was not strung up any longer than that, not that I know of. I think I would know if he had been. I think he was

not strung up to exceed nine or ten hours a day. They put him up about 6:30 or 7 I think in the morning, he was up until, I think, 12 o'clock. I think they let him down at 12 o'clock, but possibly not every day, and then again at 3. He was not up any more to my knowledge. If he was strung up any longer than that it was against my knowledge or wishes, against any knowledge I had of the matter. I was paying fairly close attention to this Willis proposition, watching the case. I did not make inquiry from Mr. Gilvin as to how long he was stringing him up each day in that connection.''

On that subject George R. Gilvin testified:

''To the best of my knowledge he was up in the rings each day nine hours; that my orders to the officer in charge of that hall, Mr. Coughlin. Do not know that he was confined more than nine hours. Do not know that he was put in at six in the morning and held until three in the afternoon, let down for a while, put up again and kept until nine at night.''

He further testified:

''Q. Can you explain how it happens that so many of these men who have testified to being in the rings were there from six in the morning till three in the afternoon and let down and put up again at four o'clock and left up until nine o'clock at night? A. No, sir. My orders have been to take them down at three o'clock in the afternoon.

''Q. Putting them up from six a. m. to nine p. m., do you think that would be excessive punishment? A. It depends upon what the crime was and the man.

''Q. Do you say you did that? A. That never has been my orders.

''Q. Do you think you would be justified in keeping men —— ? A. I have never done that and it has been my orders not to do that.

''Q. If in the Willis case he was punished from six o'clock in the morning to three in the afternoon, let down at three and put up again until nine at night, and he was off at night, with only an hour off at noon,

that was not according to your orders? A. That was not according to my orders.

"Q. And you never delivered an order for such a punishment as that? A. No, sir, I never did."

Coughlin was not put on the stand.

On the question as to whether Willis was kept in the rings to make him tell where he got the Whiskey the evidence is as follows:

The plaintiff testified:

"Q. What was he strung up there for, what was the purpose of that—to get him to confess where he got the whiskey? A. To punish him for the crime he had committed.

"Q. Wasn't he strung up there for the purpose of compelling him to confess where he obtained the whiskey? A. He was put in the rings because he had the whiskey on him, which was a violation of the rules of the institution.

"Q. That is not the question— A. I was very anxious to get any information I could get as to where the whiskey came from.

"Q. Wasn't it indicated to him that if he would confess he would be let down? A. It never was indicated to him by anybody, to my knowledge.

"Q. Do you want the jury to understand that you were not stringing him up there for the purpose of compelling a confession or seeking to gain a confession, is that right? A. He was strung up there for punishment.

"Q. Will you answer my question? A. I was anxious to get any information that I could get from him, but he was not being punished for that.

"Q. Isn't it the fact that you kept him there for that very purpose and that he so understood it and you understood it, that if he would confess he would be taken down? A. I did not so understand it.

"Q. Is it not a fact that he did tell you where the whiskey had been obtained and that you refused to let him down? A. Oh, he told me this kind of a deal; that

he found it out under a board in an old ice house, in a place that he had no business to be. Everybody knew that was not true.

"Q. He told you that was where he got it? A. He didn't tell me—he told the Deputy Warden that.

"Q. Who is that? A. Mr. Gilvin.

"Q. Deputy Gilvin? A. Deputy Warden, yes, sir.

"Q. He told him that and still he was not released? A. He told him that just after he was put up.

"Q. He told him that after he was up for sometime? A. Yes.

"Q. Still he was not released? A. Yes, sir.

"Q. Finally he stated that he obtained it from a negro there? A. Yes, sir, a fellow by the name of Major Wright.

"Q. And when he told you that you let him down? A. Well, he possibly was not let down then, but somewhere near that time.

"Q. Near the time that he said that Major Wright had given him the whiskey? A. Something near that time.

"Q. Do you know anything about that one way or the other whether he was let down just after he said that Major Wright had given him the whiskey? A. Something near that time.

"Q. What do you mean by 'something near?' A. Well, it was within twenty-four hours . . . I went down there and talked to him a number of times about various things. I asked him where he has gotten this dope and this whiskey and how much of this dope he had peddled. I was very anxious to find out the source from which he had gotten it. I think possibly he had gotten fifty pints in there. I testified in my deposition that the failure to give this information had nothing whatever to do with his being strung up and that it was not in an effort to compel him to give that information that he was strung up, but he was strung up because he violated the rules of the institution and not in an

effort to compel him to state where he got the whiskey, that that did not have anything to do with him being strung up. It did not have anything to do with his punishment, but of course we were anxious to find out the source from which the dope and whiskey came. There is no rule in the prison as to the length of time a man should be strung up for having whiskey in his possession, that is left to the Deputy Warden.''

George R. Gilvin testified:

''He was put there for punishment for having whiskey on his person. It is a violation of the rules of the prison. Kept in there twenty-one days for having whiskey on his person. Cannot say that I ever punished anyone else as many as one-half of twenty-one days for having whiskey on his person, can't say as to that, as to how many days. Could not give that approximately. Can't say whether five days, ten days or two days; have no rules to determine that. Whenever I think he is sufficiently punished. I did not tell Willis I would let him down when he told where he got the whiskey. I never punished a man in my life to wring a confession from him, since I have been connected with that institution. Nothing except having this whiskey on his person that caused the punishment. That is all. When he mentioned the name of the convict from whom he got the whiskey I let him down immediately afterward. Had not kept him up because he would not tell. Would not have done that.

''Mr. Hay. Q. You would not have considered it proper to keep him up there to get a confession out of him? A. I would not have done it.

''Q. You would not have considered it proper? A. No, sir. I punished him for violating the rules of the prison.

''Q. And you consider that it would have been inhuman to have punished him for that? A. I do. . . ''I punished Willis because he violated the rules of the prison. I did not punish him because he got the liquor.

274 Sup.—14.

I did not ask him where he got the liquor. I talked to him two or three times, I think. He finally told me he had gotten this liquor from a convict by the name of Wright. We put Wright up in the rings that day, in a short time afterwards.

"Q. In the face of that fact, that as soon as he told you about this man Wright, you let him down and Strung Wright up, still you say that you didn't put him up to extort from him the statement as to where he got it. A. I positively say so. Yes, sir."

Edwin S. Austin, editor of the "Capital News," Asa Hudson and L. O. Luetkewite, newspaper correspondents and not connected with defendant, each testified to a conversation with plaintiff in which the plaintiff stated that he would keep Willis in the rings until he told where he got the whiskey.

Plaintiff did not on the stand deny making those statements. The evidence on both sides tends to show that whipping and putting in the rings with the hands above the head have been almost if not entirely abandoned in other penal institutions in the United States. Captain Bradbury, a witness for plaintiff, testified:

"My impression is that public sentiment has been pretty strong for some time and it has been driving or inducing or persuading the officials of the penal institutions to make more moderate all the modes of punishment."

Henry Andrae, a former Warden of the Penitentiary, a witness for plaintiff, testified: "I think the rings are a more severe punishment than the lash."

Other evidence for plaintiff tended to show that the rings did not seriously endanger the health of those undergoing such punishment, and that such punishment was not very severe.

Testimony for defendant tended to show that such punishment caused severe suffering and endangered the health.

Judge Starke, a former Warden, testified for plaintiff that he had never tried to run the institution with-

out the rings and lash, but that he felt satisfied he could not do it.

There are other matters which will be stated in connection with the opinion.

Although this suit was instituted in Cole County with a change of venue to Callaway County, no question is raised on this appeal as to the right of plaintiff to sue defendant in Cole County.

I.  This case falls under the general rule of law in regard to libel of public officers as such, and does not fall under any of the exceptions to that rule. **Libel of Public Officer.** Hence we will not herein discuss any of those exceptions.

Lord Herschell in Davis & Sons v. Shepstone, 11 App. Cas. l. c. 190, 55 L. J. P. C. 51, decided in 1886, said:

"There is no doubt that the public acts of a public man may lawfully be made the subject of fair comment or criticism, not only by the press, but by all members of the public.  But the distinction cannot be too clearly borne in mind between comment or criticism and allegations of fact, such as that disgraceful acts have been committed, or discreditable language used.  It is one thing to comment upon or criticise, even with severity, the acknowledged or proved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct.

"In the present case the appellants, in the passages which were complained of as libellous, charged the respondent, as now appears without foundation, with having been guilty of specific acts of misconduct, and then proceeded on the assumption that the charges were true, to comment upon his proceedings in language in the highest decree offensive and injurious; not only so, but they themselves vouched for the statements by asserting that though some doubt had been thrown upon the truth of the story, the closest investigation would prove it to be correct.  In their Lordships' opin-

ion there is no warrant for the doctrine that defamatory matter thus published is regarded by the law as the subject of any privilege.''

Following the advice there given we have examined all the publications above mentioned, and we find therein the following specific charges of misconduct, as distinguished from the criticisms of that conduct:

1.    He is charged with whipping convicts.    The truth of that charge is admitted.

2.    He is charged with keeping Willis in the rings for fourteen hours a day for twenty days.

3.    He is charged with thus keeping him in the rings in order to compel him to confess where he got the whiskey.

The plaintiff read in evidence the two first mentioned articles which were published by defendant on November 10th.    His counsel in their brief say that those articles should be read along with the ones on which the suit is based in order to determine the meaning and to show malice.    We agree to that, especially as each of the various publications has apparent reference to the preceding ones.    When counsel brought this suit they evidently had before them all those publications, and they were choosing their point of attack.    Those publications of November 10th, considered both together, charged plaintiff in substance with keeping Willis in the rings fourteen hours a day for twenty days to compel a confession.    Those charges are clear and direct, yet plaintiff chose not to challenge them, but to base the counts of his petition on the other later publications. The first count is based on the article which spoke of the Steve Willis case and said, ''The same publicity will be given to the Governor's action in doing away with twelfth century torture methods which was given to the exposure of it.''

Respondent's brief in reference to that language says:

''So beyond all question, and we speak by the record, the truth was not what this newspaper intended to con-

vey to its readers, but a grossly exaggerated idea of the things that had been done under respondent's authority in the Missouri Penitentiary. Not that Steve Willis had been punished by being put in the rings eight or nine hours a day, for reasons demanded by conditions that obtained in the Penitentiary, at the time, having to do with the orderly conduct of its inmates, and the safety of those within and without its walls.

"It wished the public to understand from the denunciatory language sued on, which fails to tell what forms of punishment were used in the Missouri prison, and the kind applied to Willis, that *12th century torture methods* had been applied to him; the torture to which he had been subjected was such as 'to horrify the entire world,' to bring shame and disgrace upon the State, and that these torture methods were to be continued until 'he died,' absent a confession."

Thus we see that counsel desire us to treat the words "twelfth century torture methods" as if they contained a charge of some kind of torture other than keeping the convict in the rings. We decline to do so, for the following reasons: It is conceded that all those articles must be read together to get their meaning. The publications of November 10th, after setting out the charges against plaintiff, spoke of such punishment as "fourteenth century inhumanity." The very language here under discussion speaks of the twelfth century torture methods as having been "exposed." That has plain reference to the previous publications. Webster's principal definition of "torture" is, "Act or process of inflicting severe pain, especially as a punishment, in order to extort confession, or in revenge." It is there said to have been last used in England in 1640. Thus we see that any kind of punishment which causes severe pain used to compel a confession is torture, and that torture has been disused for several centuries. The words "twelfth century torture methods" plainly meant the act of plaintiff in keeping Willis in the rings to compel a confession and did not imply a charge of some other method of torture.

We think it is proper to say that plaintiff's act in ignoring the publications of November 10th, and basing the first count in the publication of November 12th, was a plain attempt to avoid the real issue and to raise a false one.

We have carefully set out all the evidence necessary to fully develope the merits of this case. The evidence on both sides shows that convicts were kept in the rings for fourteen hours a day for many days. Plaintiff justified such punishment by putting in evidence to show that it was not very severe. He read in evidence the deposition of the convict Agee, showing that Agee was in the rings fourteen hours a day for fourteen days in *December after this controversy arose.* That men were kept in the rings for fourteen hours a day for many days was deliberately put in evidence by both sides and should be accepted by this court as a fact. That Willis was kept in the rings as charged is proved by him, corroborated by the night guard in Punishment Hall, and denied by nobody. The best that plaintiff and the Deputy Warden could say on that subject was that they did not know. Both plaintiff and the Deputy Warden testified that at times while Willis was in the rings they each asked him where he got the whiskey. The Deputy Warden testified that immediately when he told from whom he got it, he was released from the rings. Three witnesses, newspaper men not connected with defendant, testified that plaintiff told them he would keep Willis in the rings until he told. Plaintiff was on the stand, but did not deny making such statements.

Plaintiff's cross-examination on the question as to whether he kept Willis in the rings to compel a confession is a plain evasion and not a denial. It is true the Deputy Warden said that he would not have kept him there for such a purpose. It must be kept in mind that this is a question as to the plaintiff's purpose in so doing, and not as to what the Deputy Warden's purpose was. The charge that plaintiff kept Willis in the rings for fourteen hours a day for twenty days to compel a

confession is proved by evidence on both sides, and we feel fully justified in saying that there is no substantial evidence to the contrary. Under such circumstances it was the duty of the trial court to consider those charges as established facts, and it should have instructed the jury accordingly.

Evidently counsel's reasons for not basing the petition on the publications of November 10th were because the truth of the charges therein made was not seriously controverted by plaintiff.

II. The charges thus made against the plaintiff in said publications being true as above shown, Criticism. the question arises as to whether the defendant exceeded the bounds of proper criticism of plaintiff's conduct.

The rule which permits the criticism of public officers is the same as that which governs the criticism of all matters of public interest, such as public institutions, places of entertainment, books, pictures and other matters of that kind.

In Dibdin v. Swan & Bostock, 1 Esp. 28, 1. c. decided in 1793, is this:

"Lord Kenyon stated the law on this subject to be—That the editor of a public newspaper may fairly and candidly comment on any place or species of public entertainment; but it must be done fairly and without malice or view to injure or prejudice the proprietor in the eyes of the public. That if so done, however severe the censure, the justice of it screens the editor from legal animadversion; but if it can be proved that the comment is unjust, is malevolent, or exceeding the bounds of fair opinion, that such is a libel, and therefore actionable."

That is a clear and concise statement of the law as it was over a century ago and as it is today. See Odgers on Libel & Slander, pp. 224 and 225, where it is also stated that the burden of showing malice is on the plaintiff. It is there stated that malice may be inferred from the terms of the article itself.

The rule that the burden is on the plaintiff to show that the comment is malicious is laid down in Cook v. Pub. Co., 241 Mo. l. c. 357, and in Link v. Hamlin, 270 Mo. l. c. 337.

What is above said has reference to comment as distinguished from a charge. Of course if one makes a libelous false charge and then proceeds to comment on the act thus charged, the falsity of the charge carries the malice into the criticism, and there is no burden on the plaintiff, in such a case, to show that the criticism was malicious. Folkard on Slander & Libel, p. 319, says that criticism cannot be fair where the charge is false.

The charges being true, we hold that there is no evidence tending to show that the criticism was malicious. When plaintiff kept Willis in the rings as he did to compel a confession he used "torture" within the dictionary meaning of that word, and the defendant in its criticism of plaintiff's acts had the right to use that word and others of equal force. The press is clearly within its rights as long as it tells the truth and "calls a spade a spade."

The judgment is reversed.

PER CURIAM:—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All of the judges concur.